**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 1, 2023**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1812**

STATE OF WISCONSIN

Cir. Ct. No. **2021TP23**

**IN COURT OF APPEALS
DISTRICT II**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO S.R.R. , A PERSON UNDER THE AGE OF 18:

KENOSHA COUNTY DIVISION OF CHILD AND FAMILY SERVICES,

  PETITIONER-RESPONDENT,

 V.

D.R.-R.,

  RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Kenosha County: JODI L. MEIER, Judge. *Reversed and cause remanded for further proceedings*.

¶1    GUNDRUM, P.J.[1]  D.R.-R. appeals from an order terminating her parental rights to S.R.R.  She asserts the circuit court erred when it granted

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

Kenosha County Division of Child and Family Services' (County) motion for default in the grounds phase of this termination of parental rights (TPR) proceeding, thereby denying D.R.-R. her right to a jury trial in that key phase. For the following reasons, we agree, and we reverse the order terminating D.R.-R.'s parental rights and remand to the circuit court for further proceedings.

## Background

¶2 The record indicates D.R.-R. was born in Guatemala, stopped attending school in the first grade, and is unable to read or write. In December 2018, she crossed into the United States with her then three-year-old daughter, S.R.R. In March 2019, S.R.R. was found to have severe injuries indicating physical and sexual abuse that reportedly occurred while D.R.-R. was at work.

¶3 The County filed a petition in April 2019 alleging S.R.R. to be a child in need of protection or services (CHIPS). By August 7, 2019, four hearings were held on the petition, all of which D.R.-R. attended in person. At an August 7, 2019 hearing, which D.R.-R. also attended in person, the circuit court adjudicated S.R.R. to be CHIPS and placed her outside the home until D.R.-R. could meet the conditions of return.

¶4 Over the course of the next two and one-half years, nine more hearings were held on the CHIPS petition.[2] D.R.-R. appeared in person for the entirety of all but two—the first and third—of these hearings. She did not attend a

---

[2] The Honorable Jodi L. Meier appears to have presided over a majority of the CHIPS and TPR hearings.

September 20, 2019 hearing to review the permanency plan for S.R.R.[3] When she failed to appear at that hearing, the court issued a capias[4] for her apprehension but stayed it until an October 1, 2019 status hearing, at which D.R.-R. appeared in person and the capias was vacated. D.R.-R. was late to a hearing on March 6, 2020, held to review the permanency plan.

¶5 On March 29, 2021, the County filed a petition to terminate D.R.-R.'s parental rights on the bases of abandonment and CHIPS. On April 27, 2021, the circuit court held the first hearing on this petition. Although not yet appointed counsel, D.R.-R. appeared in person, and a K'iche' interpreter—who interpreted for D.R.-R. at all of the hearings—appeared via Skype. At the conclusion of the hearing, the court informed D.R.-R. that she must "appear at every single hearing that we have …. If you don't show up the Court could default you for not showing up and proceed then to termination of your parental rights without a hearing. Understand?" D.R.-R. responded (through her K'iche' interpreter),[5] "Yes. I always attend and I will attend in the future. Today I was a little late, but the police was getting me confused and sending me somewhere else and I kept telling him it's this direction." The court responded, "Okay. Well, good. We know you attend so just … make sure you do; okay? Thank you."

---

[3] Both D.R.-R's counsel and the social worker appearing on behalf of the Department of Child and Family Services believed there had been a miscommunication with D.R.-R.

[4] A "capias" is "a legal writ or process commanding the officer to arrest the person named in it." *Capias*, WEBSTER'S THIRD NEW INTER'L DICTIONARY (unabr. 1993).

[5] D.R.-R., whose primary language is K'iche', was assisted by a K'iche' interpreter. Where we indicate that a statement was made by D.R.-R., it was made through the interpreter, except for one instance in which D.R.-R. herself directly responded to the circuit court, "Okay. Si." *See infra* ¶12.

¶6     The next hearing was held on May 26, 2021.  D.R.-R. appeared in person with counsel.  The K'iche' interpreter appeared via Skype and telephone. When discussing the petition documents that had been served upon D.R.-R. and her understanding or lack thereof of those, the guardian ad litem, who was familiar with D.R.-R. from the CHIPS case, advised the court, "I'm not so sure she's able to read at all in any language."  The matter was adjourned again for "an adjourned initial appearance" to be held August 5, 2021.  No "must appear" or default warning was provided by the circuit court.

¶7     D.R.-R. and her counsel again appeared in person at the August 5, 2021 hearing, with the K'iche' interpreter appearing via Skype.  The circuit court spent some time trying to get D.R.-R. to understand that when it asked her if she wanted to substitute the judge in the case that the court was not asking if she wanted to change attorneys.  When asked again by the court, "[D]o you understand that you have the right to have a different Judge if you want to?" D.R.-R. responded,

> Yes.  I understand.  I have friends that tell me that I have rights and that I can fight about anything….  I know we have a lot of things that happened in our lives that we have to fight for anything that happened.  For example, my country there is not a perfect place.  There's a lot of things that happened and not only to me, but to people all over the world have things happening to them and I just want to say that I understand that and thank you.

¶8     Counsel for D.R.-R. entered a plea on D.R.-R.'s behalf denying the allegations of the petition and requesting a jury trial.  When the circuit court subsequently asked D.R.-R. if she understood that she had "the right to have your jury trial on the issue of whether grounds exist to terminate your parental rights within 45 days of today?  Do you understand that you have that right…?"  D.R.-R. responded, "Yes, but I'm not understanding the meaning of the word trial.  What

4

does that word mean?" When the court asked again if she agreed with going past the "45-day mark" for a trial in order to give her counsel sufficient time to prepare, D.R.-R. responded, "I think I'm okay with that. When I think about a trial sometimes I think that perhaps everybody have already agreed and given my child for adoption and taken her away from me forever."

¶9 At the end of the August 5 hearing, the circuit court advised D.R.-R.: "[Y]ou are ordered to appear for all of your court hearings and if you would fail to show for your court hearings you could be found in default and you could possibly forfeit your attorney as well. Do you understand that?" D.R.-R. responded, "Yes." The court then asked if she had "any questions about that," to which she responded, "No, I don't have any, but I would like to tell all of you that while we all have a right and about asking for forgiveness that perhaps I have missed my court hearing at some time, but I'm asking for forgiveness to all, please."

¶10 A jury status hearing was held on November 2, 2021. D.R.-R. again appeared in person, along with her counsel, and the K'iche' interpreter appeared again via Skype. In responding to the court's inquiry as to the status of the case for a jury trial, counsel for D.R.-R. responded, "I can say to the Court that I have had difficulty in explaining the process from start to finish to [D.R.-R.]." Counsel for the County agreed, stating, "[I]t is my belief that it will take a significant amount of time for mother to understand the process of potentially resolving this case; much less the process of a jury trial," and added, "It is very difficult to be able to have a constructive meeting due to the significant language barrier here and … the existence of essentially only one nationwide [K'iche'] interpreter."

¶11 Counsel for D.R.-R. indicated to the circuit court that "in terms of discovery, my review of the discovery clearly highlights … issues for trial."

Counsel further stated that her "continued conversations with [D.R.-R.] essentially has led me to believe that … she was not understanding a lot in the beginning when I thought she was understanding." Counsel expressed that her "communications with [D.R.-R.] have led me to believe we have … a lot more work to do to make sure that I know that she understands what's happening." She added,

> [P]rior to my more lengthy conversation with her today I felt as if this might be a case of competency because her ability to understand the process, the words, the terminology, the orders of the Court, what she's required to do.
>
> ….
>
> Prior to the last week I thought I would have to be raising competency because of those issues. However, over the last week my conversations with her, my maybe adjusting the way I ask things, adjusting the way she answers certain questions or getting more information about that has led me to believe we do have competency. It's just a matter now of us being on the same page so I do think we can get there. It has just been a journey.

The court stated that "[i]t doesn't sound like we[ are] looking at [a trial] any time soon." When the court asked counsel for D.R.-R. how long she would need in order to ensure she was prepared for trial, counsel responded, "60 days." The court adjourned the trial scheduled for the following week, and instead of "just sticking a trial date on in January and then forgetting about it until the Thursday before," set a status conference for November 16, 2021, "to get a better sense of what might happen." The court also stated that the father's TPR case, which had been tracking along with D.R.-R.'s, was set to be addressed at that November 16 hearing for purposes of taking testimony "on grounds to support a default request for the father."

¶12    Before concluding the November 2 hearing, the court advised D.R.-R. as to the need for her to appear at future hearings. The colloquy went as follows:

> THE COURT: … [D]o you understand that if you don't show up for court you could be found in default which means that you may not be able to contest whether grounds exist to terminate your parental rights?
>
> [D.R.-R.]: Well, yeah. Yes. If I don't appear here in court they can send the police after me at home and bring me to court. No?
>
> THE COURT: Well, I'm not going to do that. I'm telling you you have to appear or I can make orders that will not allow you to contest certain parts of this case going forward. Do you understand that?
>
> [D.R.-R.]: Oh. Well, no, I would have to appear at every court hearing … moving forward.
>
> THE COURT: Yes because I'm trying to tell you what would happen in the event that you didn't show up and I could find you in default which means that you could be prohibited or you would not be able to contest parts or all of this termination of parental rights proceeding. Do you understand that so far?
>
> [D.R.-R.]: Well, I don't know how much longer this case will last because I'm worried that it's lasting a long time and well they're the ones that are moving the case.
>
> THE COURT: Okay. You're just kind of getting ahead of it. I just need to know if you understand if you don't appear for court you might—I may not let you contest parts of the case going forward. That's all I need to know if you understand. Do you understand that? That means I can find you in default and then—
>
> ([D.R.-R.] speaking in K'iche')
>
> THE COURT: Ms. Sass [interpreter], I don't know if you got that, but we can't hear you so if you are saying something—

7

INTERPRETER[/D.R.-R.]: Oh, I am sorry. Yes. She said I would like to ask for forgiveness because I believe I missed a court hearing last week[6] because they called me informing me that I had to come to court and I was not able to come at that time and I believe I missed a hearing.

THE COURT: Okay. Well, I'm not talking about anything last week. I don't know what that was. I'm talking about this case and the next, every hearing after this one you have to be in court. Do you understand that?

[D.R.-R.]: Okay. Si.

THE COURT: Okay. Thank you. And if … you do not appear you could be—you could lose the right to contest part or all of this case. Do you understand that? I'm telling you what will happen if you don't show.

[D.R.-R.]: Well, no. Well, it depends if they call me and inform me because I have my phone number. If they just inform me about the date and time I will appear as well.

THE COURT: No, *you're missing the point*. I'm just telling you you have to appear. It's not a matter because we give you the date here in court. Nobody's gonna call you. If you do not appear at every court hearing you will not be allowed to contest part or all of this hearing and you could lose your attorney. Just need to know that you understand that.

MS. REINKE [Counsel for *the County*]: Your Honor, if I could just interject? We've been using—mother uses the word *fight*. Fighting this case. Fighting for her daughter. *I don't think she understands contest*, but I think she might understand it better if you say she doesn't have the ability to fight this.

INTERPRETER[/D.R.-R.]: Your Honor, her response was yes.

THE COURT: Okay. All right. So then I—she said yes to my question so we're good. All right. That will conclude

---

[6] We see no indication in the record that D.R.-R. had any court hearing the prior week. Due to the significant language challenges, it is possible she was referring to having previously missed a court hearing in the CHIPS case, two years earlier, or to some meeting related to the TPR case.

the hearing. Thank you. We will see everybody on
November 16th at 2:45 p.m. for status, further proceedings,
and for testimony on grounds to support a default request
for the father. All right. Thank you.

(Emphasis added.)

¶13    D.R.-R. did not appear at the November 16 status conference. When
the circuit court asked counsel for D.R.-R. at that November 16 hearing about the
status of the case, counsel responded that she

> had the opportunity to have several conversations … with
> [D.R.-R.] and of course with the help of [the K'iche'
> interpreter] and I have had the opportunity to speak with
> [counsel for the County] about the case. I believe … it was
> the mother's intention to still go forward with trial.
>
> I did take a significant amount of time in explaining to
> her what it means to have [a] trial and how she feels and
> basically … what a trial would entail and I feel confident
> that she does in her way understand what the process is,
> and her desire was to dispute what was being said. So … I
> believe that we were in trial posture.

¶14    Noting that D.R.-R. had previously been warned of consequences for
failing to appear, the County stated that it was "mov[ing] for default of the mother
and the father at this time and I would ask the Court to allow me to take testimony
at this time." D.R.-R.'s counsel opposed the motion, stating:

> I would oppose a finding of default at this time…. [A]s I
> indicated I have spoken to her several times and … I know
> that the Court was very simply trying to tell her that if she
> missed court that she could be found in default. I think that
> did create a bunch of confusion in her mind.
>
> I believe we had talked about it, this date, the last time that
> we had a conversation which was last week. I do not have
> an explanation for her nonappearance. However, I have
> personally been in court for the last hour so.
>
> I have not had an opportunity myself to reach out and
> try to contact her…. [S]he has always, always been
> available to me or to [the interpreter] for communication so

9

I would ask the Court at least just hold the default in abeyance at this time.

¶15    The circuit court noted that D.R.-R. had been "given default warnings" at three prior hearings and "she's had legal counsel … since May and so at this time … I will find her in default subject to the ability [of the County] to prove on grounds." The court added, "[I]f she comes in during the testimony on grounds regarding the father and/or her well then I can revisit that, but we can go forward at this point with that." The court then proceeded to take evidence in support of the grounds for termination of D.R.-R.'s and the father's parental rights. After a short while, counsel for D.R.-R. interrupted:

> I just object to going into grounds at this stage quite obviously because I was not prepared to argue grounds on behalf of the mother who is not here unfortunately so I would just object at this time to going forward on grounds testimony on grounds with regard to the mother….
>
> THE COURT:  You've been on the case since May of 2021 and you know if a person doesn't show up they can be defaulted and testimony on grounds can be taken and so I'm just I don't quite understand … how rushed that is.
>
> [COUNSEL]:  … Typically if there is a default finding … first, usually there is some type of warning that the default is going to come whether that's official or not, but then there's also it's very rare that it's immediate testimony on grounds for the defaulted parent.  So I would just … ask for time to prepare for testimony on grounds with regard to the mother.
>
> THE COURT: Well, it's a default.  You don't get to contest it.  That's the [County] has to prove up the grounds, so—
>
> [COUNSEL]:  Right.  But I get to cross-examine.
>
> THE COURT:  You can.  Right.  But I'm gonna deny that at this time and I'm thinking you would know the case since you've been on it since May.  So I understand that you might not have planned for a default testimony today and I would disagree that it rarely happens that you go right to it.  It's just a matter of if there's time or not and you're a

10

seasoned attorney so I'm going to continue to deny your request.

Testimony on the grounds phase against the mother continued.

¶16     Testimony on the father's and mother's TPR petitions concluded in less than one hour.  After finding grounds had been proven against the father, the circuit court noted that D.R.-R. still had not arrived in court, and it found that grounds had been proven against her as well.  The court then scheduled the matter for the disposition phase of the proceedings.

¶17     On December 17, 2021, D.R.-R.'s counsel filed a motion to vacate the default, asserting that D.R.-R. struggled to communicate effectively due to the language barrier and her low IQ.  Counsel further asserted that on the day of the November 16 status hearing, D.R.-R. waited on the street corner for counsel to pick her up and take her to court, and when counsel did not arrive, D.R.-R. assumed court had been cancelled.[7]  The circuit court denied the motion to vacate.

¶18     D.R.-R.'s parental rights were terminated in the disposition phase. D.R.-R. filed a postdisposition motion seeking to vacate the default in the grounds phase and the order terminating D.R.-R.'s parental rights.  After a hearing on the motion, the circuit court denied it.   D.R.-R. now challenges both the court's

---

[7] The record shows that D.R.-R. had received rides from other service providers to appointments and on at least one prior occasion, her previous attorney had given her a ride to court.  Indeed, at a hearing on the motion to vacate the default, counsel for D.R.-R. indicated that she had driven D.R.-R. to the November 2 hearing (which immediately preceded the November 16 status conference that D.R.-R. missed) and had driven her home after a November 1 meeting.

default determination denying her a jury trial in the grounds phase and its decision denying her motion to vacate.[8]

## *Discussion*

¶19　A termination of parental rights affects some of a parent's "most fundamental human rights." *Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶20, 246 Wis. 2d 1, 629 N.W.2d 768. "At stake for a parent is his or her 'interest in the companionship, care, custody, and management of his or her child.'" *Id.* (quoting *T.M.F. v. Children's Serv. Soc'y*, 112 Wis. 2d 180, 184, 332 N.W.2d 293 (1983)). Moreover, a termination order is permanent and thereby "work[s] a unique kind of deprivation. In contrast to matters modifiable at the parties' will or based on changed circumstances, termination adjudications involve the awesome authority of the State to destroy permanently all legal recognition of the parental relationship." *Evelyn C.R.*, 246 Wis. 2d 1, ¶20 (quoting *M.L.B. v. S.L.J.*, 519 U.S. 102, 127-28 (1996) (citations omitted; alteration in original)). Thus, "termination proceedings require heightened legal safeguards against erroneous decisions." *Evelyn C.R.*, 246 Wis. 2d 1, ¶21.

¶20　Here, the circuit court terminated D.R.-R.'s parental rights after sanctioning her by defaulting her in the grounds phase for her failure to appear at the November 16, 2021 hearing. The County asserts the court's default sanction is supported by both WIS. STAT. §§ 806.02(5) and 805.03. WISCONSIN STAT. § 806.02(5) provides: "A default judgment may be rendered against any party who has appeared in the action but who fails to appear at trial." As relevant, WIS.

---

[8] Because we conclude the circuit court erred in determining D.R.-R. defaulted in the first instance, we need not address whether it also erred in denying her motion to vacate.

STAT. § 805.03 states: "[F]or failure of any party to … obey any order of court, the court in which the action is pending may make such orders in regard to the failure as are just …." The court's determination that D.R.-R. defaulted is not supported by either of these statutory provisions.

¶21     We review for an erroneous exercise of discretion a circuit court's sanction of default based on a litigant's conduct. *Industrial Roofing Servs., Inc. v. Marquardt*, 2007 WI 19, ¶41, 299 Wis. 2d 81, 726 N.W.2d 898; *Evelyn C.R.*, 246 Wis. 2d 1, ¶18. We will sustain "[a] discretionary decision … if the circuit court has examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Industrial Roofing Servs.*, ¶41 (citing *Johnson v. Allis Chalmers Corp.*, 162 Wis. 2d 261, 273, 470 N.W.2d 859 (1991)). Any "[f]actual findings made by the circuit court will not be disturbed unless they are clearly erroneous. A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." *Lowe's Home Ctrs., LLC v. City of Delavan*, 2023 WI 8, ¶25, 405 Wis. 2d 616, 985 N.W.2d 69 (citation omitted).

## WISCONSIN STAT. § 806.02(5)

¶22     The plain language of WIS. STAT. § 806.02(5) shows that it does not provide legal authority for the default in this case. That provision authorizes entry of a default judgment if the party "fails to appear at *trial*." Sec. 806.02(5) (emphasis added). In this case, the circuit court scheduled the November 16 hearing as merely a "status, further proceedings" hearing; it would be neither a

13

trial nor even another jury status conference.[9] The County has not provided us with any case law suggesting § 806.02(5) has been interpreted by controlling authority in a manner other than what the plain language states—that this statute simply does not apply unless a party fails to appear "at trial." Moreover, because D.R.-R. appeared at the November 16 hearing through counsel, "[t]his case does not fall within the scope of WIS. STAT. § 806.02(5)." *See* ***Evelyn C.R.***, 246 Wis. 2d 1, ¶17 ("Although [the mother] was not physically present at the fact-finding hearing, she nevertheless 'appeared' at the hearing via her counsel. Thus, § 806.02(5) does not govern the outcome of this case.").

### WISCONSIN STAT. § 805.03

¶23 The County's second stated source of authority for the default—WIS. STAT. § 805.03—fares no better because the circuit court's determination of default due to D.R.-R.'s failure to appear on November 16, 2021, was not "just" under the circumstances.

¶24 WISCONSIN STAT. § 805.03 "limit[s] the sanctions that circuit courts may impose … for failure to comply with court orders to those that are 'just.'" ***Industrial Roofing Servs.***, 299 Wis. 2d 81, ¶43. A sanction of default in a civil case—a "particularly harsh sanction"—is "just" if the non-complying party's conduct has been "egregious[]" or "in bad faith." ***Dane Cnty. Dep't of Human***

---

[9] We appreciate likely reasons why this default authority is limited to circumstances in which a party fails to appear "at trial." With a trial, subpoenas have been issued, witnesses are set to testify, a jury has been assembled, attorneys have expended time preparing, and significant court time has been set aside to hear the trial. With something like a simple "status, further proceedings" hearing, none of those things have occurred. Furthermore, a "trial" is to resolve the matter on the merits, with the finality of bringing the matter to a head/conclusion—"put up or shut up" time; not so with a simple status conference or "further proceeding[]."

*Servs. v. Mable K.*, 2013 WI 28, ¶69, 346 Wis. 2d 396, 828 N.W.2d 198 (quoting *Industrial Roofing Servs.*, 299 Wis. 2d 81, ¶43); *Waukesha Cnty. Health & Human Servs. v. S.S.*, No. 2020AP592, unpublished slip op. ¶13 (WI App June 10, 2020) (expressing that entry of a default judgment is "a particularly harsh sanction").  Our supreme court has stated plainly that "[b]efore a circuit court may enter a default on the ground that a party failed to comply with a court order, the party's conduct *must be* egregious or in bad faith."  *State v. Shirley E.*, 2006 WI 129, ¶13 n.3, 298 Wis. 2d 1, 724 N.W.2d 623 (emphasis added).  Bad faith is not an issue in the case now before us, so for the circuit court to have properly determined D.R.-R. defaulted at the grounds phase of this TPR proceeding, thereby denying her her right to a jury trial, her conduct leading to the default had to have been egregious.

¶25     An act is egregious if it is "extraordinary in some bad way; glaring, flagrant."  *Sentry Ins. v. Davis*, 2001 WI App 203, ¶21 n.8, 247 Wis. 2d 501, 634 N.W.2d 553.   "Egregious conduct means a conscious attempt to affect the outcome of litigation or a flagrant, knowing disregard of the judicial process." *Morrison v. Rankin*, 2007 WI App 186, ¶20, 305 Wis. 2d 240, 738 N.W.2d 588. "Where a circuit court concludes that a party's failure to follow court orders, though unintentional, is 'so *extreme, substantial <u>and</u> persistent*' that the conduct may be considered egregious, the circuit court may make a finding of egregiousness."  *Mable K.*, 346 Wis. 2d 396, ¶70 (emphasis added) (quoting *Hudson Diesel, Inc. v. Kenall*, 194 Wis. 2d 531, 543, 535 N.W.2d 65 (Ct. App. 1995)).

¶26     Because D.R.-R.'s conduct leading to the circuit court's November 16 default determination, including her absence at the November 16 hearing, was not egregious, the court's decision to default her in the grounds phase

15

constituted an erroneous exercise of its discretion. As a result, we reverse the order terminating D.R.-R.'s parental rights and remand to the circuit court for further proceedings.

¶27 In the case now before us, D.R.-R. had appeared at all four of the court hearings on this case prior to the November 16 hearing, including the first hearing before she even had an attorney. She was present in the courtroom at the November 2, 2021 hearing, which was intended to be a jury status hearing for a trial expected to be held the following week. Due to conflicts with the interpreter's schedule and to allow counsel for D.R.-R. time to adequately prepare for trial, at that November 2 hearing, the circuit court adjourned the scheduled jury trial. Counsel for D.R.-R. indicated she had been having "difficulty in explaining the process from start to finish to [D.R.-R.]" and asked for sixty days to allow her to properly prepare for trial. The *County's counsel* added, "[I]t is my belief that it will take a significant amount of time for mother to understand the process of potentially resolving this case; much less the process of a jury trial." The court stated that "instead of just sticking a trial date on in January and then forgetting about it until the Thursday before," it would schedule a status conference for two weeks "to get a better sense of what might happen."

¶28 As with the conclusion of some, but not all, of the prior hearings on the case, the circuit court ordered D.R.-R. to appear at future hearings. Regarding the default warning given at the November 2 hearing, the County writes in its appellate brief, "The court ordered D.R.-R. to appear, stating 'do you understand that if you don't show up for court you could be found in default which means that you may not be able to contest whether grounds exist to terminate your parental rights?' D.R.-R. answered, 'Well, yeah. Yes.'" The County significantly mischaracterizes the record; D.R.-R.'s full response was, "Well, yeah. Yes. If I

16

don't appear here in court they can send the police after me at home and bring me to court. No?" So, while the County tries to represent to us that D.R.-R. clearly understood at this point in the hearing what would happen if she did not appear in court on November 16, the transcript actually shows she had a significant misunderstanding of how things would play out. The court recognized that the situation was not clear to D.R.-R., as it then spent another three pages of transcript trying to get D.R.-R. to the point of understanding that it could determine she defaulted, and the consequences of such a determination, if she failed to appear at a future hearing. Indeed, at the end of this substantial effort, it should have been apparent to everyone at the hearing that D.R.-R. did *not* have a clear understanding as to what would happen if she failed to appear at the November 16—or any other—hearing.

¶29 After D.R.-R. indicated her belief that police would be sent to her home to bring her to court if she did not appear at a future hearing, the November 2 hearing continued and concluded as follows:

> THE COURT: Well, I'm not going to do that. I'm telling you you have to appear or I can make orders that will not allow you to contest certain parts of this case going forward. Do you understand that?
>
> [D.R.-R.]: Oh. Well, no, I would have to appear at every court hearing … moving forward.
>
> THE COURT: Yes because I'm trying to tell you what would happen in the event that you didn't show up and I could find you in default which means that you could be prohibited or you would not be able to contest parts or all of this termination of parental rights proceeding. Do you understand that so far?
>
> [D.R.-R.]: Well, I don't know how much longer this case will last because I'm worried that it's lasting a long time and well they're the ones that are moving the case.

17

THE COURT: Okay. You're just kind of getting ahead of it. *I just need to know if you understand* if you don't appear for court you might—I may not let you contest parts of the case going forward. That's all I need to know if you understand. Do you understand that? That means I can find you in default and then—

([D.R.-R.] speaking in K'iche')

THE COURT: Ms. Sass [interpreter], I don't know if you got that, but we can't hear you so if you are saying something—

INTERPRETER/[D.R.-R.]: Oh, I am sorry. Yes. She said I would like to ask for forgiveness because I believe I missed a court hearing last week because they called me informing me that I had to come to court and I was not able to come at that time and I believe I missed a hearing.

THE COURT: Okay. Well, I'm not talking about anything last week. I don't know what that was. I'm talking about this case and the next, every hearing after this one you have to be in court. Do you understand that?

[D.R.-R.]: Okay. Si.

THE COURT: Okay. Thank you. And if … you do not appear you could be—you could lose the right to contest part or all of this case. Do you understand that? I'm telling you what will happen if you don't show.

[D.R.-R.]: Well, no. Well, it depends if they call me and inform me because I have my phone number. If they just inform me about the date and time I will appear as well.

THE COURT: No, *you're missing the point*. I'm just telling you you have to appear. It's not a matter because we give you the date here in court. Nobody's gonna call you. If you do not appear at every court hearing you will not be allowed to *contest* part or all of this hearing and you could lose your attorney. *Just need to know that you understand that*.[10]

MS. REINKE [counsel for *the County*]: Your Honor, if I could just interject? We've been using—*mother uses the*

---

[10] So, at this point, the circuit court did *not* believe D.R.-R. had a clear understanding.

> *word fight*. Fighting this case. Fighting for her daughter. *I don't think she understands contest*, but I think she might understand it better if you say she doesn't have the ability to fight this.
>
> INTERPRETER[/D.R.-R.]: Your Honor, her response was yes.
>
> THE COURT: Okay. All right. So then I—she said yes to my question so we're good. All right. That will conclude the hearing. Thank you. We will see everybody on November 16th at 2:45 p.m. for status, further proceedings, and for testimony on grounds to support a default request for the father. All right. Thank you.

(Emphasis added.)

¶30 The "contest"/"fight" potential clarification the County thought important for the circuit court to address with D.R.-R. never occurred. The court's diligent and patient efforts to communicate with D.R.-R. to that point had not proven very fruitful. Understandably, the court appeared to have been frustrated with D.R.-R.'s difficulty in understanding the proceedings and what was at stake, and it seems the court did not want to reopen a can of worms by seeking to clarify "fight" versus "contest."

¶31 It is undisputed and clear from the record that D.R.-R. is a person of low intelligence and education. Due to this and the significant language barrier, the record is replete with examples of her challenges in understanding the court process. Indeed, based upon the record, including discussion by the parties and the court at the November 2 hearing, significant question exists as to whether D.R.-R. understood the meaning of legal terms such as "default," "grounds," "terminate," and "contest." Although the circuit court later made a finding at a postdisposition hearing that there was "[n]othing to indicate that [D.R.-R.] didn't understand the consequences of what flowed from a nonappearance," this finding is "against the great weight and clear preponderance of the evidence." *See Lowe's*

*Home Ctrs.*, 405 Wis. 2d 616, ¶25. But even if the court was correct with this finding, one missed appearance in this case at a status conference, especially in light of D.R.-R.'s clear intellectual and language challenges, did not rise to the level of egregious conduct.

¶32 As we know, D.R.-R. did not appear at the November 16 status conference. When the circuit court asked counsel for D.R.-R. at that hearing about the status of the case, counsel responded that she

> had the opportunity to have several conversations … with [D.R.-R.] and of course with the help of [the K'iche' interpreter] and I have had the opportunity to speak with [counsel for the County] about the case. I believe … it was the mother's intention to still go forward with trial.
>
> I did take a significant amount of time in explaining to her what it means to have trial and how she feels and basically … what a trial would entail and I feel confident that she does in her way understand what the process is, and her desire was to dispute what was being said. So … I believe that we were in trial posture.

¶33 D.R.-R. had a strong record of appearing personally at hearings in the case—even before she had counsel—and there was no indication she was abandoning, or even taking lightly, her effort to "fight" to protect her parental rights to S.R.R. Nonetheless, the County moved for default. D.R.-R.'s counsel opposed the motion, stating:

> [A]s I indicated I have spoken to her several times and … I know that the Court was very simply trying to tell her that if she missed court that she could be found in default. I think that did create a bunch of confusion in her mind.
>
> I believe we had talked about it, this date, the last time that we had a conversation which was last week. I do not have an explanation for her nonappearance. However, I have personally been in court for the last hour so.

I have not had an opportunity myself to reach out and try to contact her…. [S]he has always, always been available to me or to [the interpreter] for communication so I would ask the Court at least just hold the default in abeyance at this time.

¶34 Noting that D.R.-R. had been "given default warnings" at three prior hearings and "had legal counsel … since May," the circuit court granted the County's motion "subject to the [County's] ability to prove on grounds," adding, "[I]f she comes in during the testimony on grounds regarding the father and/or her well then I can revisit that, but we can go forward at this point with that." The court took evidence in support of the grounds for termination of the father's and D.R.-R.'s parental rights. After a short while, counsel for D.R.-R. interrupted:

I just object to going into grounds at this stage quite obviously because I was not prepared to argue grounds on behalf of the mother who is not here unfortunately so I would just object at this time to going forward on grounds testimony on grounds with regard to the mother….

THE COURT: You've been on the case since May of 2021 and you know if a person doesn't show up they can be defaulted and testimony on grounds can be taken and so I'm just I don't quite understand … how rushed that is.

[COUNSEL]: … Typically if there is a default finding … first, usually there is some type of warning that the default is going to come whether that's official or not, but then there's also it's very rare that it's immediate testimony on grounds for the defaulted parent. So I would just … ask for time to prepare for testimony on grounds with regard to the mother.

THE COURT: Well, it's a default. You don't get to contest it. That's the [County] has to prove up the grounds, so—

[COUNSEL]: Right. But I get to cross-examine.

THE COURT: You can. Right. But I'm gonna deny that at this time and I'm thinking you would know the case since you've been on it since May. So I understand that you might not have planned for a default testimony today and I would disagree that it rarely happens that you go right

21

> to it. It's just a matter of if there's time or not and you're a seasoned attorney so I'm going to continue to deny your request.

Testimony on the grounds phase against the mother continued.

¶35 Testimony as to the grounds on the father's and mother's TPR petitions concluded in less than an hour. After finding grounds had been proven against the father, the circuit court noted that D.R.-R. still had not arrived, and it then determined that D.R.-R. defaulted in the grounds phase and found that grounds had been proven against her as well. The court then scheduled the matter for the disposition phase of the proceedings.

¶36 Where it was abundantly clear that D.R.-R. was of low intelligence, had significant language problems, and was simply not sophisticated or knowledgeable as to how the court system works, no reasonable judge, based upon this record, could have concluded that her failure to appear on November 16 was egregious and justified a default in the grounds phase, taking away her right to a jury determination on grounds.

¶37 At that November 16 hearing, the circuit court made no mention of any prior missed appearances by D.R.-R. in the CHIPS case. Even if the court's reference at the postdisposition hearing to a hearing D.R.-R. missed in the CHIPS case had been and could properly be considered in the court's default decision in this separate case, one prior missed appearance[11] two years earlier—out of nearly twenty hearings—hardly constitutes "extreme, substantial, and persistent" conduct

---

[11] There was another hearing in the CHIPS case, on March 6, 2020, at which D.R.-R. appeared as the hearing concluded. At the postdisposition hearing in this case, the court referred to this as an additional "miss in my book."

22

of concern. *See **Industrial Roofing Servs.**, 299 Wis. 2d 81, ¶43 (quoting **Hudson Diesel**, 194 Wis. 2d at 543). Her failure to appear on November 16, 2021, was not "extraordinary in some bad way; glaring, flagrant." *See **Sentry Ins.**, 247 Wis. 2d 501, ¶21 n.8. There is no indication it was a "conscious attempt to affect the outcome of litigation or a flagrant, knowing disregard of the judicial process." *See **Morrison**, 305 Wis. 2d 240, ¶20.

¶38 No jury trial was set for November 16—another jury status conference was not even scheduled for that date (and D.R.-R. was present at the prior jury status conference on November 2). D.R.-R.'s counsel was in court and available to set future trial and pre-trial conference dates if that is what the court intended to do. While it was important for D.R.-R. to appear on November 16, nothing in the record indicates her absence significantly obstructed advancement of the proceedings. More importantly, however, nothing indicates she was trying to thwart the process or thumb her nose at the court by failing to appear or that she simply did not care.

¶39 The County has not identified any case in which the circuit court determined a parent's conduct was egregious and granted default on such a meager record. This is a far cry from cases such as **S.S.**, No. 2020AP592, **State v. K.C.**, No. 2017AP32, unpublished slip op. (WI App April 25, 2017), and **State v. Marquita R.**, Nos. 2010AP1979, 2010AP1980 and 2010AP1981, unpublished slip op. (WI App Dec. 14, 2010), in which the circuit courts determined a parent was in default in the grounds phase based on the parent's egregious conduct. In **S.S.**, the mother "falsified her medical records and lied to the court" in an effort to get the fast approaching trial adjourned. **S.S.**, No. 2020AP592, ¶9. In **K.C.**, the mother "lied to her lawyer, knowing that that false information [that she had checked herself into the hospital] would be repeated" to the court, and she did so

"intend[ing] to manipulate [the circuit c]ourt's calendar" and prevent the court from conducting the grounds-phase jury trial. *K.C.*, No. 2017AP32, ¶15. In *Marquita R.*, the mother "intentionally delayed the proceedings by appearing at various emergency rooms and hospitals on court dates with bogus or suspect claims of illness" on multiple occasions. *Marquita R.*, Nos. 2010AP1979, 2010AP1980 and 2010AP1981, ¶1. Here, there is no indication that D.R.-R. lied to anyone, much less the court, and there was no jury trial set. There was no indication of any kind that D.R.-R. was deliberately attempting to thwart the TPR process.

¶40 In conclusion, D.R.-R. did not engage in egregious conduct as was necessary for the court to default her. As a result, the circuit court erroneously exercised its discretion in granting the County's default motion at the grounds phase of this TPR proceeding. We reverse the order terminating D.R.-R.'s parental rights, and we remand to the circuit court for further proceedings.

*By the Court.*—Order reversed and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.